IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.*: | : | |
| JAMES E. REEVES, | : | |
| | : | |
| v. | : | CASE NO.: 1:13-CV-108 (LJA) |
| | : | |
| MERCER TRANSPORTATION | : | |
| COMPANY, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

## ORDER

Before the Court is Defendant's Motion to Dismiss for Failure to State a Claim (Doc. 32). For the reasons that follow, Defendant's Motion to Dismiss (Doc. 32) is **GRANTED in part and DENIED in part**. The Government's claims for unjust enrichment and payment by mistake are dismissed. All other claims remain.

## BACKGROUND

Relator James E. Reeves initiated this action on June 27, 2013. (Doc. 1). The United States of America elected to intervene in this matter on July 25, 2016 (Doc. 21), and filed its Complaint on October 31, 2016 (Doc. 24). Therein, the United States alleges that Defendant Mercer Transportation Company, Inc. committed violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729, as well as inducement of breach of fiduciary duty, fraud, unjust enrichment, and payment by mistake in violation of Georgia state law. *Id.* at ¶¶ 128-153.

I. **Military Freight Transportation**

Defendant Mercer Transportation Company, Inc. ("Mercer") is a trucking company that provides transportation services to both commercial and government customers, including the Marine Corps Logistics Base ("MCLB") in Albany, Georgia. *Id.* at ¶ 2. MCLB's

1

principal mission is to rebuild and repair ground combat and combat-support equipment and to support military installations throughout the United States. *Id.* at ¶ 26. The Defense Logistics Agency (the "Agency") manages the re-utilization of military equipment as well as supply distribution, and coordinates the transportation of these items to and from military bases around the world. *Id.* at ¶ 27. The Agency maintains a presence on MCLB. *Id.* at ¶ 28. The Agency Traffic Office at MCLB planned, arranged, and coordinated the shipment of all sensitive freight material that required transportation protective services, including arms, ammunition, explosives, and classified and controlled cryptographic items. *Id.* at ¶ 29. Mercer drivers David Nelson, J.M., and M.H. were authorized by the Department of Defense ("DOD") to transport sensitive freight. *Id.*

Transportation Service Providers ("Service Providers"), such as Mercer, enter into contracts with DOD to transport shipments via the Global Freight Management System ("GFMS"). *Id.* at ¶ 32. Service Providers submit standing offers, known as tenders, to the GFMS for specific categories of shipments they are capable of carrying. *Id.* When MCLB has a load ready for shipment, an Agency employee is supposed to enter the required shipment details into the GFMS, and the GFMS dispenses a list of Service Providers that have submitted tenders matching the specific parameters required for that shipment. *Id.* at ¶ 34. The list of Service Providers is arranged according to price, and using the "best value" approach required by DOD, the Agency official is expected to move down the list from least to most expensive and select the first available Service Provider. *Id.* at ¶¶ 33-34.

Once a Service Provider is selected, a Government Bill of Lading is generated based on the Service Provider's tender. *Id.* at ¶ 35. When the driver arrives at his destination site, the goods are inspected by a government employee; and the driver confirms delivery with the Service Provider. *Id.* at ¶ 37. The Service Provider then confirms delivery in the Third Party Payor System, and the third party payor with which the United States has contracted to administer payments pays the Service Provider the amount listed in the bill of lading on behalf of the United States. *Id.* The United States' money is transmitted to the Service Provider through the Third Party Payor System. *Id.*

## II. The Bribery Scheme

As part of the bribery scheme, Mercer agents and employees Ivan Brannan, David Nelson, J.M., and M.H.[1] bribed DOD employees Mitchell Potts and Jeffrey Philpot to award sensitive freight shipments to Mercer. *Id.* at ¶¶ 3, 4, 11, 12, 15. According to Potts and Philpot, Mercer would not have otherwise received the contracts for those shipments. *Id.* at ¶ 4. Also under the scheme, the parties conspired to inflate the shipping costs. *Id.*

Brannan was an agent of Mercer with the authority to bid on and accept sensitive freight shipments out of MCLB. *Id.* at ¶ 12, 36. Mercer had actual knowledge of and accepted all awards of sensitive freight shipments out of MCLB. *Id.* at ¶ 39. Mitchell Potts and Jeffrey Philpot were members of the Agency Traffic Office and had the responsibility for awarding sensitive freight shipments to Service Providers. *Id.* at ¶ 30.

When a shipment for non-sensitive freight was awarded to Mercer, Brannan entered the shipment documentation directly into Mercer's computer system. *Id.* at ¶ 44. When a sensitive freight shipment was awarded to Mercer, the shipment information was placed in a separate queue accessible only by a special committee of Mercer's managers, the Truck Operations Managers ("TOM"). *Id.* at ¶¶ 44-45. This committee, which included Jack Lubay, handled specific transportation related issued in close coordination with John Fallot. *Id.* at ¶¶ 44-45. After the information was placed in the special queue, the TOM would assign sensitive freight shipments to particular drivers who met the security requirements applicable to that shipment. *Id.* at ¶ 48. Fallot serves as Mercer's General Manager of Branch Offices and Business Development and is one of five general managers at Mercer with significant authority and responsibility over the day-to-day management of the company. *Id.* at ¶ 47. Lubay is Mercer's Manager of Government Operations, and reports directly to Fallot. *Id.* at ¶ 46.

Potts, Philpot, Brannan, and Nelson have all pled guilty to their role in the bribery scheme. *Id.* at ¶¶ 9-16. As part of the factual basis for his guilty plea, Brannan admitted to mailing cash gifts, providing cruise tickets, planning a hunting trip, and regularly purchasing meals for Potts in exchange for Potts continuing to award sensitive freight shipments out of

---

[1] J.M. and M.H. are Mercer Drivers whose names have been kept confidential by the United States.

3

MCLB to Mercer. *Id.* at ¶¶ 55-57, 61, 94. Philpot received cash payments for his role in the scheme. *Id.* at ¶ 58-59, 90. Brannan admitted to directing Nelson to make cash payments to Potts and Philpot when Nelson picked up loads awarded to Mercer from MCLB. *Id.* at ¶ 58-59. As a part of the factual basis for his guilty plea, Nelson admitted that he paid Potts between $500 and $1,500 per shipment awarded to Mercer. *Id.* at ¶ 60. In at least one instance, the vacation expenses for Potts were listed on Mercer's Expense Report as "Entertainment Expenses" for "Mitchell Potts-MCLB." *Id.* at ¶ 62.

Brannan also admitted that Mercer would not have been awarded the subject contracts without the bribes. *Id.* at ¶ 56. Potts and Philpot admitted that they awarded the shipments to Mercer because of the bribes. *Id.* at ¶ 80. In the factual basis for his guilty plea, Potts admitted that he accepted bribes from Nelson, J.M., M.H., and Brannan in exchange for awarding shipments leaving from MCLB. *Id.* at ¶¶ 86-87. After Potts was promoted, Philpot admitted that he began accepting bribes in exchange for awarding shipments to Mercer. *Id.* at ¶ 90.

Beginning in 2007, several Mercer drivers complained about the favorable treatment received by Nelson, J.M., and M.H. *Id.* at ¶ 64. In response to these complaints, Mercer established a Dedicated Driver Program. *Id.* at ¶ 66. Under this program, all sensitive freight loads were to be assigned by the TOM to one of the drivers in the program before any others were considered. *Id.* at ¶ 69-70. The drivers in the program included Nelson, J.M., and M.H. *Id.* at ¶ 66. The creation of the program allowed Mercer to continue bribing Potts and Philpot with less suspicion. *Id.* at ¶ 69-70. Despite continued complaints to Mercer of suspicions of bribery and favorable treatment, Mercer continued the Dedicated Driver Program without investigation. *Id.* at ¶ 74-76.

From October 2006, to April 2012, a total of 1,333 Government Bills of Lading were awarded to Mercer as a result of the bribery scheme. *Id.* at ¶ 100. During this time, Mercer drivers Nelson, J.M., and M.H hauled numerous sensitive freight loads from MCLB in which multiple bills of lading were used to contract for the transportation of goods on one truck by one driver, instead of using one bill of lading with multiple stop-offs. *Id.* at ¶¶ 63, 100. The use of multiple bills of lading rather than a single bill of lading with multiple stop-offs

4

resulted in higher costs for the government. *Id.* at ¶ 63. Nelson stipulated in the factual basis for his guilty plea that the loads resulting from the bribes involved multiple bills of lading shipped on a single truck and that the planning of shipments in this manner led to substantial profits for Mercer, Brannan, and Nelson. *Id.* at ¶ 98. For example, on October 7, 2011, Nelson arrived at MCLB with one trailer, which he proceeded to load with deliveries under four separate bills of lading. *Id.* at ¶ 102. Three of the delivery locations were in California, and the fourth was in Nevada. *Id.* By using four bills of lading instead of one bill of lading with stop-off charges, Mercer received payment for mileage for four cross-country shipments, instead of mileage for one cross-country trip, plus the mileage for the additional stops. *Id.* at ¶¶ 103-104. As a result, Mercer was paid $26,562.88 instead of $7,084.23. *Id.* at ¶105.

The Government alleges that: Nelson transported the loads contained in 333 bills of lading in this manner, J.M transported the loads contained in 439 bills of lading in this manner, and M.H. transported the loads contained in 361 bills of lading in this manner. *Id.* at ¶¶ 101-127. The Government also attached to the complaint a list of all affected bills of lading transported by each driver that includes the Government Bill of Lading number, the pickup date, the drop-off date, the Third Party Payor System transaction identification number, and the billed total. (Docs. 24-1; 24-2; 24-3).

In 2006, before the bribery scheme was fully implemented, Mercer was paid approximately $278,652 for shipments arising out of MCLB. (Doc. 24, ¶ 81). In 2007, however, the total payments jumped to $6,500,000. *Id.* Between 2007 and 2012, Mercer was paid approximately $23,000,000 from shipments arising from MCLB. In 2013, after Potts and Philpot were terminated, the total payments drastically decreased to $218,000. *Id.*

**LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) allows a party to assert the defense of failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), the complaint must plead enough facts to state a claim for relief that is plausible—not just conceivable—on its face. *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007). Restated, "the factual allegations in the complaint must possess enough heft to set forth a plausible entitlement to relief." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010) (internal citation and punctuation marks omitted).

On a motion to dismiss, the Court "construes the complaint in the light most favorable to the plaintiff and accepts all well-pled facts alleged [] in the complaint as true." *Sinaltrainal v.Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009), abrogated on other grounds by *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702 (2012). The "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While notice pleading is a liberal standard, "it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. A "plaintiff's obligations to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). Moreover, when evaluating the sufficiency of a complaint, the Court must "make reasonable inferences in plaintiff's favor;" however, the Court is "not required to draw plaintiff's inference[s]." *Sinaltrainal*, 578 F.3d at 1260 (quoting *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005)), abrogated on other grounds by *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702 (2012).

**DISCUSSION**

I. **Statute of Limitations**

Defendant argues that the Government's FCA claims, as well as the Government's claims for fraud and for inducement of breach of fiduciary duty are barred by the statute of limitations. (Doc. 32-1, pp. 26-27, n.17). "Generally, a statute of limitations defense is an affirmative defense that must be pled. However, failure to comply with the statute of limitations may be raised on a motion to dismiss for failure to state a claim for which relief can be granted under Fed. R. Civ. P. 12(b)(6) when failure to comply with the statute of limitations is plain on the face of the complaint." *Foster v. Savannah Communication*, 140 F.

App'x 905, 907 (11th Cir. 2005). Mercer bears the initial burden of demonstrating when the claims accrued and that the statute of limitations has run. *See, e.g.*, *United States v. Quicken Loans, Inc.*, 2017 WL 930039, at *22 (E.D. Mich. March 9, 2017). Pursuant to 31 U.S.C. § 3731(c), the Government's Complaint (Doc. 24) relates back to the filing date of the Relator's Complaint (Doc. 1), because all of the Government's claims "arise[ ] out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of that person." *See U.S. ex rel. Frascella v. Oracle Corp.*, 751 F. Supp. 2d 842, 853-54 (E.D. Va. 2010). Accordingly, the statutes of limitation for the Government's FCA and state law claims were tolled as of June 27, 2013. (Doc. 1).

The statute of limitations for the FCA claims is governed by 31 U.S.C. § 3731(b), which states that the Government may not bring a FCA claim "more than 6 years after the date on which the violation… is committed" or "3 years after the date when facts material to the right of action are known or reasonably should have been known to the official of the United States charged with responsibility to act in the circumstances," whichever is later. Accordingly, Mercer would need to show that the relevant government officials knew of the purported FCA violations before June 27, 2010. Mercer's only argument that the United States knew of these violations before June 27, 2010 is that the Mercer received an anonymous e-mail on February 3, 2008 containing allegations of bribery which the sender also alleged had been sent to the USMC fraud department. (Doc. 24, ¶ 74). In the FCA context, only Department of Justice officials are deemed to be officials "charged with responsibility to act in the circumstances." *See United States v. Kellogg Brown & Root Services, Inc.*, 2016 WL 5344419, at *6 (C.D. Ill. Sept. 16, 2016). Even assuming that the sender e-mailed this complaint to the USMC fraud department, which is not alleged definitively, there is no allegation that this e-mail was forwarded to anyone at the Department of Justice. Accordingly, Mercer has not met its burden of demonstrating that the statute of limitations has run with regard to the FCA claims.

Mercer has also failed to carry its burden regarding the tort claims. The statute of limitations on tort claims is three years. *See* 28 U.S.C. § 2415(b) ("[E]very action for money damages brought by the United States…which is founded upon a tort shall be barred unless

7

the complaint is filed within three years after the right of action first accrues."); *see also U.S. ex rel. Sansbury v. LB&B Associates, Inc.*, 58 F. Supp. 3d 37, 52-53 (D.D.C. 2014). The Government's state law claims are subject to tolling if the "facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances." 28 U.S.C. § 2416(c). While, in this context, "the responsible official is the official who is also responsible for the activity out of which the action arose," *U.S. v. Bollinger Shipyards, Inc.*, 2013 WL 393037, at *13 (E.D. La. 2013), Mercer has not established that an email actually was sent to the USMC fraud department or that the alleged email contained "facts material to the right of action."

Accordingly, as the Court cannot determine that the Government's allegations are time-barred from the face of the Complaint, the statute of limitations is not a ground on which to dismiss the above captioned case.

II. **False Claims Act**

Under the FCA, anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States is liable to the Government for a monetary penalty and treble damages. 31 U.S.C. § 3729(a)(1)(A). The FCA also attaches liability to those who conspire to violate the Act. 31 U.S.C. § 3729(a)(1)(C). To prevail on a FCA claim, the Government must prove three elements: "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." *U.S. v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349, 1355 (11th Cir. 2005).

Defendants argue that the Government's False Claims Act causes of action fail to state a claim because: (1) the Government fails to allege that Mercer submitted any claim for payment to the United States; (2) any claim submitted to the United States was not false; (3) the Government's Complaint is not pled with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b); and (4) the Government fails to allege that Defendant had knowledge of the submission of false claims.

8

### a. Submission of a claim

"The submission of a claim is…the *sine qua non* of a False Claims Act violation." *U.S. ex. rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002). "Without the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act." *Id.* The FCA defines "claim" as:

> any request or demand, whether under a contract or otherwise, for money or property…that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(b)(2)(A).

In its Complaint, the Government alleges that Defendant confirmed delivery in the Third Party Payor System electronic system after delivering a shipment. (Doc. 24, ¶ 37). According to the Government, this confirmation triggered payment to Defendant through U.S. Bank, the third party payor that the United States contracted with to administer payments. *Id.* The Government attached tables to the Complaint that list the following information about shipments from MCLB delivered by Mercer's drivers: the Government Bill of Lading number, the pickup date, the delivery date, the "[Third Party Payor System] Transaction ID," and the "billed total." (Docs. 24-1, 24-2, 24-3).

Defendant argues that these tables are not sufficient to show that it presented a "claim" for payment to the United States, because "the only documents identified by Plaintiff are tenders and [bills of lading], and neither constitutes [sic] claims for payment." (Doc. 32-1, pp. 18-21). There is no requirement in the FCA that a claim must be formally written. Defendant submitted claims to the United States using the prescribed electronic system, the Third Party Payor System. In doing so, Defendant made a "request…for money…presented to…an agent of the United States." 31 U.S.C. § 3729(b)(2)(A).

Accordingly, the tables of shipment information are sufficient to allege that Defendant made claims to the United States under the FCA.

### b. Falsity

Defendant argues that, even if it submitted claims to the United States, the Government has failed to identify any *false* claim because the Government does not identify any false information in the claims Defendant submitted. The Government argues that "this case does not involve the submission of documents or records that, on their face, contain false information," but rather that the case should proceed under a theory of FCA liability known as fraudulent inducement. (Doc. 35, p. 6).

The basis for the fraudulent inducement theory of liability is the Supreme Court decision, *U.S. ex. rel. Marcus v. Hess*, 317 U.S. 537 (1943). In *Hess*, the Supreme Court found that contracts obtained under a collusive bidding scheme violated the FCA by defrauding the government and compelling it to pay more "than it would have been required to pay had there been free competition in the open market." *Id.* at 539 n.1, 546. The Court held that the "fraud did not spend itself with the execution" of the original contract, but that "[i]ts taint entered into every swollen estimate which was the basic cause for payment" which followed. *Id.* at 544. To prevail under a fraudulent inducement theory, the United States must show that a false statement, omission, or misrepresentation "'caused' or 'induced' the government to enter into a contract, such that but for the misrepresentations, the government would not have awarded the contract and would not have paid the claim." *United States ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540, 569 (E.D. Pa. 2014); *see also United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 128 F. Supp. 3d 1, 18 (D.D.C. 2015).

The Eleventh Circuit has not addressed the fraudulent inducement theory of liability, but, since *Hess*, other Circuits have recognized "False Claims Act liability for each claim submitted to the government under a contract, when the contract or extension of government benefit was obtained originally through false statements or *fraudulent conduct*." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787 (4th Cir. 1999) (emphasis added); *see also U.S. ex. rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006); *U.S. ex. rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005); *U.S.*

*ex. rel. Longhi v. U.S.*, 575 F.3d 458, 467-68 (5th Cir. 2009); *U.S. ex rel. Thomas v. Siemens AG*, 593 F.App'x 139, 143 (3d Cir. 2014). The fraudulent inducement theory was also expressly recognized in the legislative history accompanying the FCA 1986 amendments:

> [E]ach and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim. For example, all claims submitted under a contract obtained through collusive bidding are false and actionable under the act.

S.Rep. No. 99-345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274.

Claims that result from illegal conduct are not necessarily false, however. *See U.S. v. Shaw*, 725 F. Supp. 896, 900 (S.D. Miss. 1989) ("The bare fact that bribes were involved in this case, a fact established conclusively by the prior criminal proceeding, does not necessarily lead to the further conclusion that false or fraudulent claims were made. . ."); *Kellogg Brown & Root Services, Inc. v. U.S.*, 99 Fed. Cl. 488, 513 (Ct. Fed Cl. 2011) (holding that a FCA claim cannot be "based on taint from a kickback alone."). In order for a FCA claim based on fraudulent inducement from illegal conduct to proceed, the plaintiff must show that something "induced the Government to pay out money it would not have paid but for the misrepresentations." *Kellogg Brown & Root Services*, 99 Fed. Cl. at 513. The Complaint sufficiently alleges that, through the bribery scheme, the Government was induced to enter into shipping contracts and make payments that it otherwise would not have entered into and made.

The Government alleges, by specific reference to the factual bases for the actors' guilty pleas, that the bribes paid by Brannan and Nelson induced Potts and Philpot to award shipments to Mercer that "Mercer otherwise would not have been awarded." (Doc. 24, ¶ 56). In *Hess*, the Court found that the contractors collectively agreed to submit inflated bids to the government and, relying on the falsely inflated bids, the government was fraudulently induced into awarding the contract. 317 U.S. at 542-44. Thus, the Supreme Court found that all claims submitted under this fraudulently induced contract were false for the purposes of the FCA. *Id.* at 544. Similarly, in *Longhi*, the Fifth Circuit found that Defendant misrepresented itself to the Government in a grant proposal, fraudulently inducing the

11

Government to award Defendant the grant, and rendering all claims for payment under the terms of the grant false for the purposes of FCA liability. 575 F.3d at 471; *see also Harrison*, 176 F.3d at 794 (finding FCA liability when defendants made intentional misrepresentations in matters material to the government's decision to grant a subcontract).

While the mere existence of a bribery scheme is not sufficient to establish the existence of false statements for FCA purposes, *see Kellogg-Brown & Root Services*, 99 Fed. Cl. 488 and *Shaw*, 725 F. Supp. at 900, the Government does not ask the Court to draw such a conclusion. By alleging that, but for the bribery scheme, the Government would have awarded the shipments to other Service Providers at a lower cost, the Government has sufficiently alleged that it was fraudulently induced into entering into shipping contracts with Mercer.[2] Accordingly, the Court finds that the Government adequately has alleged the falsity of claims submitted by Mercer to the United States.

### c. Rule 9(b)

Defendant also claims that the FCA claims are insufficient under Federal Rule of Civil Procedure 9(b). *See U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1308-09 (11th Cir. 2002). Rule 9(b) requires parties alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Interpreting Rule 9(b) in the context of FCA claims, the Eleventh Circuit directs plaintiffs to plead "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." *Clausen*, 290 F.3d at 1310 (internal quotations omitted). The complaint must contain "some indicia of reliability… to support the allegation of *an actual false claim* for payment being made to the government." *Id.* at 1311. In *Clausen*, the Eleventh Circuit found that the complaint failed to meet the standard of Rule 9(b) when the plaintiff "merely" described "a private scheme in detail…without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Id.* Similarly, in *Corsello v. Lincare, Inc.*, the Eleventh Circuit found that the complaint failed to adequately allege violations of the FCA when the relator alleged the

---

[2] The Court notes that the allegations in the Complaint are sparse; however, they are sufficient to put the Defendant on notice and to state a claim at this motion to dismiss stage.

12

existence of improper billing practices, but "did not explain why he believes fraudulently claims were ultimately submitted." 428 F.3d 1008, 1013-14 (11th Cir. 2005).

Mercer argues that, like the relators in *Clausen* and *Corsello*, the Government "fails to identify any false claims for payment to the government." (Doc. 32-1, p. 17). In its brief, Mercer conflates its arguments about the existence of claims and theories of falsity under the FCA with the requirements of Rule 9(b). As held above, the Government has sufficiently alleged the existence of legally false claims for the purposes of the FCA. The question here is whether the Government provided sufficient indicia of reliability that such false claims were actually submitted to the United States. In contrast to the relators in *Clausen* and *Corsello*, the Government attached exhibits to the Complaint that identify hundreds of actual claims for payment to the United States. (Docs. 24-1, 24-2, 24-3). Furthermore, the Government specifically alleged the details of how the contracts giving rise to such claims were fraudulently obtained through bribery and the individual actors involved in the bribery scheme. Accordingly, the Government adequately alleged violations of the FCA under Rule 9(b).

### d. <u>Knowledge</u>

Finally, with regard to the FCA claims, Defendant argues that the Government has failed to allege that Mercer knowingly presented false claims because it does not allege that Mercer authorized Brannan and Nelson to submit bribes, that Brannan and Nelson were managerial employees acting in the scope of their employment, or that Mercer ratified their actions. (Doc. 37, p. 9). The FCA only creates liability for those who "knowingly present" false claims to the United States. The FCA defines the terms "knowing" and "knowingly" to mean that a person "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The FCA does not require "proof of specific intent to defraud." § 3729(b)(1)(B). Moreover, "[a]t the pleading stage, 'knowledge, and other conditions of a person's mind may be alleged generally.' " *U.S. ex. rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1224 (11th Cir. 2012).

The Government alleges that Mercer had actual knowledge of the bribery scheme in several ways. First, the Government alleges that Mercer's management created and expressly approved the Dedicated Drivers Programs after other employees complained of favorable treatment to Nelson, J.M., and M.H. in order to continue allowing the drivers who were bribing Potts and Philpot exclusive access to the sensitive freight shipments from MCLB (Doc. 24, ¶¶ 66-73). Second, the Government alleges that Fallot, one of Mercer's five general managers, approved the payment of a bribe on a Mercer expense report, specifically, the expenses arising out of a hunting trip for "Mitchell Potts-MCLB." *Id.* at ¶¶ 61-62. Third, the Government alleges that Mercer received at least three e-mails containing allegations of bribery related to the Dedicated Driver Program, and failed to investigate or end the program. *Id.* at ¶¶ 74-75. Finally, the Government generally alleges that, "Mercer knew, or should have known, that the Sensitive Freight shipments from MCLB it had been awarded, and that it was continuing to receive, were tainted by bribery." *Id.* at ¶ 73. At the pleading stage, these allegations are sufficient to satisfy the FCA's knowledge requirement.

Furthermore, in FCA cases, "knowledge of an employee is imputed to the corporation when the employee acts for the benefit of the corporation and within the scope of his employment." *Grand Union Co. v. U.S.*, 696 F.2d 888, 891 (11th Cir. 1983). There is no requirement, as Mercer suggests, that these employees must work in a managerial capacity. *See id.* ("We rejected the contractor's claim that a corporation may not be charged with the knowledge of an employee who was not responsible for the operations of the corporation."). Nor is there any requirement that an employee's actions be specifically authorized or ratified by the employer. The Government alleges that Brannan, Nelson, and the other drivers were Mercer's agents or employees and that, in their scope of employment as brokers and drivers, they bribed government employees for the benefit of the company. For the purposes of evaluating a motion to dismiss, the Government has sufficiently alleged that Mercer "knowingly" presented false claims to the United States.

### III. State law claims

In addition to its claims under the FCA, the United States also alleges common law fraud, inducement of breach of fiduciary duty, unjust enrichment, and payment by mistake in violation of Georgia state law. The Court has original jurisdiction over these claims under 28 U.S.C. § 1345.

#### a. Unjust enrichment and payment by mistake

Under Georgia law, a plaintiff may plead inconsistent and alternative claims, but may not claim, in a single count, that there was an agreement between the parties and that the defendant was unjustly enriched. *See Clark v. Aaron's, Inc.*, 914 F. Supp. 2d. 1301, 1309-10 (N.D. Ga. 2012) (holding that a complaint may not "plead an unjust enrichment claim in the alternative to a claim for breach of contract when it is undisputed (or when the court has found) that a valid contract exists").

Mercer argues that the existence of contracts for shipment preclude the Government's claims for unjust enrichment and payment by mistake. The Government counters that courts routinely allow these claims to proceed in the alternative to FCA claims. While the Government is correct that courts usually allow claims for unjust enrichment and payment by mistake to proceed in the alternative to FCA claims, this rule does not apply when there are allegations of an underlying contract. *U.S. v. First Choice Armor & Equipment, Inc.*, 808 F. Supp. 2d 68, 77-78 (D.D.C. 2011) (holding that allegations that there was a contract between the parties "preclude a plaintiff from proceeding on alternative theories of FCA liability and unjust enrichment or payment by mistake"). The Government consistently refers to Government Bills of Lading and the agreements at issue in this case as contracts. (Doc. 24, ¶¶ 32, 35, 51, 63, 105, 114, 123). Therefore, the alternative pleading is improper. Furthermore, even if the Government were allowed to proceed with these claims in the alternative, the Complaint "does not indicate that its claims are asserted as alternative theories of recovery," and "does not allege that the contracts…are invalid or potentially invalid." *See American Casual Dining, L.P. v. Moe's Southwest Grill, LLC*, 426 F. Supp. 2d 1356, 1371 (N.D. Ga. 2006) (dismissing promissory estoppel claim). Accordingly, these claims are properly dismissed.

15

### b. Common law fraud

To state a claim for fraud under Georgia law, the Government must allege: "(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." *ReMax North Atlanta v. Clark*, 244 Ga. App. 890, 893 (2000). Under Georgia law, "mere concealment of a material fact, unless done in such as matter to deceive or mislead," will not support an action for fraud. O.C.G.A. § 51-6-2.

In its Complaint, the Government alleges that Mercer's fraudulent misrepresentation was that: "the [bills of lading] for which Mercer confirmed delivery were shipped in accordance with contract requirements when, in fact, Mercer was engaged in a fraudulent scheme… for the award of the [bills of lading]." (Doc. 24, ¶ 141). The Government alleges that Mercer concealed the bribery scheme in an effort to mislead the United States so that it would continue to award shipments to Mercer. The Government also alleges that Mercer intended for the Government to rely on these misrepresentations and that the Government did, in fact, justifiably rely on the misrepresentation that the shipments were not obtained by bribery. Thus, the Government has sufficiently alleged fraud under Georgia state law.

### c. Inducement of breach of fiduciary duty

To state a claim for inducement of breach of fiduciary duty under Georgia law, the Government must allege: "(1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposefully and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff." *Cottrell v. Smith*, 299 Ga. 517, 531-32 (2016). As employees of the United States that were authorized to enter into contracts for shipment with third parties, Potts and Philpot had a fiduciary duty to the United States to refrain from participating in a scheme for bribery. *See Wright v. Apartment Inv. and Management Co.*, 315 Ga. App. 587, 593 (2012).

Mercer first argues that the Government failed to allege any conduct by Mercer that induced Potts and Philpot to breach their fiduciary duty because the Government's allegations were limited to bribes initiated by Brannan and Nelson. The Government did, however, allege that Brannan and Nelson were agents of, and employed by, Mercer. (Doc. 24, ¶¶ 12, 63). Under the theory of vicarious liability, employers are generally jointly liable for torts committed by employees in the scope of their employment. Accordingly, the Government has sufficiently alleged that Mercer procured the alleged breach of fiduciary duty.

Mercer also argues that the Government fails to allege the requisite intent because Mercer did not act maliciously. But, it is "not essential" that Mercer had "personal ill will or animosity" to have acted knowingly and maliciously. *Insight Technology, Inc. v. FreightCheck, LLC*, 280 Ga. App. 19, 26 n.13 (2006). Georgia courts define "maliciously" as "any unauthorized interference, or any interference without legal justification or excuse." *Id.* The Government alleges that "Mercer intentionally induced Potts and Philpot … to breach their duties" by offering bribes." (Doc. 24, ¶ 138). Having alleged that Mercer employees intentionally interfered with the award of shipping contracts by bribery, the Government sufficiently alleged that Mercer acted with the requisite intent.

Finally, Mercer argues that the Government cannot establish that Potts' and Philpot's breach proximately caused the United States damages. At the motion to dismiss stage, the Government does not have to offer proof of damages. It is enough to allege that Mercer's conduct caused the Government damage. *See NCI Group, Inc. v. Cannon Services, Inc.*, 2009 WL 2411145, at *14 (N.D. Ga. Aug. 4, 2009) (denying motion to dismiss when Plaintiff "alleges that [Defendants'] 'wrongful conduct proximately caused damages to NCI.' ") In addition to specifically alleging that the inducement of breach of duty caused damage to the United States (Doc. 24, ¶ 139), the Government repeatedly alleges that the United States was made to pay more for shipments than it would have absent the bribery scheme. *See, e.g.*, *id.* at ¶¶ 105, 114, 123. Accordingly, Mercer's Motion to Dismiss the Government's claim for inducement of breach of fiduciary duty is denied.

17

## CONCLUSION

Based on the foregoing, Defendant's Motion to Dismiss for Failure to State a Claim (Doc. 32) is **GRANTED in part and DENIED in part**. The Government's claims for unjust enrichment and payment by mistake are dismissed. All other claims remain.

**SO ORDERED**, this  28th  day of   April  , 2017.

/s/ Leslie J. Abrams
**LESLIE J. ABRAMS, JUDGE**
**UNITED STATES DISTRICT COURT**